K<span>AREN</span> P<span>OINDEXTER</span>,

    Plaintiff,

v.

N<span>ATION</span>S<span>TAR</span> M<span>ORTGAGE</span> and
P<span>ETRU</span> P<span>USTA</span>,

    Defendants.

_____/

Case No. 17-cv-11937

U<span>NITED</span> S<span>TATES</span> D<span>ISTRICT</span> C<span>OURT</span> J<span>UDGE</span>
G<span>ERSHWIN</span> A. D<span>RAIN</span>

U<span>NITED</span> S<span>TATES</span> M<span>AGISTRATE</span> J<span>UDGE</span>
S<span>TEPHANIE</span> D<span>AWKINS</span> D<span>AVIS</span>

## A<span>MENDED</span> O<span>PINION AND</span> O<span>RDER</span> D<span>ENYING</span> P<span>LAINTIFF'S</span> M<span>OTION FOR</span> E<span>X</span> P<span>ARTE</span> T<span>EMPORARY</span> R<span>ESTRAINING</span> O<span>RDER</span> [5]

### I. Introduction

This is mortgage foreclosure case. Plaintiff, who is a disabled, wheelchair-bound individual, requests the Court to temporarily restrain the Defendants from evicting her and her family from their current home. For the reasons that will follow, the Court will DENY Plaintiff's Motion for Ex Parte Temporary Restraining Order [5].

### II. Factual Background

Many of the facts in this case remain unknown. Plaintiff, Karen Poindexter, is physically disabled. She has been diagnosed with Sarcoidosis and Ataxia. According to her doctor, these conditions make her unable to move from her home. Her condition is not likely to improve. Dkt. No. 4, p. 26 (Pg. ID 40). Ms.

Poindexter has resided at 13041 Oak Park Blvd. in Oak Park, Michigan since at least 2001. *Id.*, p. 7 (Pg. ID 21). It seems that Ms. Poindexter defaulted on her mortgage and her home was sold via sheriff's deed, on July 26, 2016. *Id.*, p. 16 (Pg. ID 30). On November 11, 2016, Ms. Poindexter requested an occupied conveyance from the U.S. Department of Housing and Urban Development (hereinafter "HUD"). *Id.*, p. 24 (Pg. ID 38).

There are two defendants in this case: NationStar Mortgage, LLC (hereinafter "NationStar"), the residential mortgage servicer, and Petru Pusta. Dkt. No. 1, pp. 2–3 (Pg. ID 2–3). Petru Pusta purchased the property from NationStar. *Id.* p. 2 (Pg. ID 2). According to a judgment entered in Michigan's 45th District Court on June 19, 2017, Petru Pusta "can apply for an order evicting [Ms. Poindexter] if [Ms. Poindexter] does not move out on or before 6/29/17." On June 19, 2017, Plaintiff filed her Complaint. On June 29, 2017 at 3:50 p.m., Plaintiff filed an Ex Parte Motion for Temporary Restraining Order.

### III. Legal Standard for Temporary Restraining Order

A district court must assess four factors in deciding whether to issue a preliminary injunction or temporary restraining order: "(1) whether the plaintiff has established a substantial likelihood or probability of success on the merits; (2) whether there is a threat of irreparable harm to the plaintiff; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the

public interest would be served by granting injunctive relief." *Nightclubs, Inc. v. City of Paducah*, 202 F.3d 884, 888 (6th Cir. 2000). "The four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met." *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 230 (6th Cir. 2003).

### IV. Analysis

The Complaint asserts two counts against the Defendants: (1) violation of the Real Estate Settlement Procedures Act ("RESPA"); and (2) breach of contract.

**1. Success on the Merits**

Plaintiff has not established a substantial likelihood or probability of success on the merits of her claims.

<u>A. RESPA and 12 C.F.R. § 1024.41</u>

Plaintiff alleges that the Defendants violated RESPA by failing to engage in loss mitigation efforts to avoid the foreclosure of a HUD-insured single family residence. Dkt. No. 1, p. 3 (Pg. ID 3). Ms. Poindexter bases this claim on 12 C.F.R. § 1024.41, "a regulation promulgated by the Consumer Financial Protection Bureau under the Real Estate Settlement Procedures Act, 12 U.S.C. § 2605." *Brimm v. Wells Fargo Bank, N.A.*, No. 16-2070, 2017 WL 1628996, at *2 (6th Cir. May 2, 2017). Section 1024.41 states the following:

> A borrower may enforce the provisions of this section pursuant to section 6(f) of RESPA (12 U.S.C. 2605(f)). Nothing in § 1024.41

> imposes a duty on a servicer to provide any borrower with any specific loss mitigation option. Nothing in § 1024.41 should be construed to create a right for a borrower to enforce the terms of any agreement between a servicer and the owner or assignee of a mortgage loan, including with respect to the evaluation for, or offer of, any loss mitigation option or to eliminate any such right that may exist pursuant to applicable law.

12 C.F.R. § 1024.41(a).

Section 1024.41 goes on to describe a loan servicer's obligations: upon receipt of a loss mitigation application, while evaluating a loss mitigation application, and after denial of a loan modification options. *Id*. For example, § 1024.41 "requires mortgage servicers to make decisions on loan modification requests in a timely manner and prohibits servicers from foreclosing if a mortgagor submits a complete modification application more than 37 days before a scheduled sale." *Brimm*, 2017 WL 1628996, at *2.

In this case, the Complaint states that, "Defendant repeatedly moved the loan to 'foreclosure status' without fully addressing and reviewing all documents supplied by the Plaintiff." Dkt. No. 1, p. 5 (Pg. ID 5). Even accepting the Plaintiff's allegations as true, the Plaintiff fails to demonstrate a likelihood of success on her claim that the Defendants violated § 1024.41. The loss mitigation procedures articulated in § 1024.41 require a borrower to submit a loss mitigation application to the loan servicer. Receipt of a loss mitigation application triggers the servicer's responsibilities.

Here, Plaintiff fails to allege (in the Complaint or the motion) that she ever submitted a loss mitigation application. Indeed, the Plaintiff attached copies of the deed, mortgage, doctor's notes, and a copy of federal regulations to her motion and complaint. However, missing from Plaintiff's materials is any loss mitigation application. Accordingly, without proof or even an allegation that the Plaintiff submitted a loss mitigation application, the Defendants cannot be liable for a violation of loss mitigation procedures.

### B. Breach of Contract

Count II of the Complaint alleges that "NationStar failed to adhere to the clear contractual language in the mortgage[,] which placed a clear duty to comply with the applicable federal statutes and regulations." Dkt. No. 1, p. 6 (Pg. ID 6).

"Under Michigan law, the elements of a breach of contract claim are the following: (1) a contract existed between the parties, (2) the terms of the contract required performance of certain actions, (3) a party breached the contract, and (4) the breach caused the other party injury." *Green Leaf Nursery, Inc. v. Kmart Corp.*, 485 F. Supp. 2d 815, 818 (E.D. Mich. 2007).

In this case, a mortgage contract existed between the Plaintiff and Mortgage Electronic Registration Systems, Inc. as a nominee for Countrywide Home Loans, Inc. *See* Dkt. No. 4, p. 7 (Pg. ID 21). The mortgage was eventually assigned to Defendant NationStar. *Id.*, p. 13 (Pg. ID 27). Therefore the first element for breach

of contract is met. The mortgage incorporates federal housing regulations. *Id.*, p. 10 (Pg. ID 24). Therefore, the second element is met.

Plaintiff argues that NationStar breached federal regulations and therefore the mortgage because she was denied an "occupied conveyance." Dkt. No. 5, p. 4 (Pg. ID 58).

HUD offers single-family mortgage insurance programs to incentivize private mortgage lenders to provide mortgage loans to borrowers who might not otherwise qualify for mortgages in the private market. *See* 12 U.S.C. § 1709 ("The Secretary is authorized, upon application by the mortgagee, to insure as hereinafter provided any mortgage offered to him which is eligible for insurance as hereinafter provided, and, upon such terms as the Secretary may prescribe, to make commitments for the insuring of such mortgages prior to the date of their execution or disbursement thereon."). In the event of foreclosure, a mortgagee *may* try to collect on the mortgage's insurance by conveying the property to HUD. *See* 12 U.S.C. § 1710. In order to collect on the insurance benefits, a mortgagee must comply with HUD policies. *Id*.

"HUD usually requires that any property conveyed to it be conveyed vacant unless the occupant makes a timely request for permission to continue to occupy the property." *Estep v. Manley Deas Kochalski, LLC*, 942 F. Supp. 2d 758, 763–64 (S.D. Ohio 2013), *aff'd*, 552 F. App'x 502 (6th Cir. 2014) (citing 24 C.F.R. §

203.678(a)). However, there are certain exceptions to general rule that property must be vacant when conveyed.

> (a) Occupancy because of temporary, permanent, or long-term illness or injury of an individual residing in the property will be limited to a reasonable time, to be determined by the Secretary on a case-by-case basis, and will be permitted only if all the conditions in this paragraph (a) are met:
> > (1) A timely request is made in accordance with § 203.676, including the submittal of documents required in § 203.675(b)(4).
> > (2) The occupant agrees to execute a month-to-month lease, at the time of acquisition of the property by the Secretary and on a form prescribed by HUD, and to pay a fair market rent as determined by the Secretary. The rental rate shall be established on the basis of rents charged for other properties in comparable condition after completion of repairs (if any).
> > (3) The occupant's total housing cost (rent plus utility costs to be paid by the occupant) will not exceed 38 percent of the occupant's net effective income (gross income less Federal income taxes). However, a higher percentage may be permitted if the occupant has been paying at least the required rental amount for the dwelling, or if there are other compensating factors (e.g., where the occupant is able to rely on cash savings or on contributions from family members to cover total housing costs).
> > (4) The occupant agrees to allow access to the property (during normal business hours and upon a minimum of two days advance notice) by HUD Field Office staff or by a HUD representative, so that the property may be inspected and any necessary repairs accomplished, or by a sales broker.
> > (5) The occupant discloses and verifies Social Security Numbers, as provided by part 200, subpart T, of this chapter.

24 C.F.R. § 203.674.

Here, Plaintiff argues that she is entitled to an occupied conveyance pursuant to 24 C.F.R. § 203.674, but "due to an error, the property was not returned to

HUD, but sold to a third party." Dtk. No. 5, p. (Pg. ID 56). To bolster her argument, Plaintiff submitted a signed "Request for Occupied Conveyance" form, signed on November 10, 2016. Dkt No. 5-1, p. 14 (Pg. ID 78).

There is a fatal flaw in the Plaintiff's argument—requesting an occupied conveyance does not require a mortgagee to convey the property to HUD, rather Plaintiff's entitlement to an occupied conveyance is not triggered unless the mortgagee conveys the property to HUD.

> The Secretary *may* pay insurance benefits *if* the mortgagee has acquired title to the mortgaged property through foreclosure or has otherwise acquired such property from the mortgagor after a default upon--
> **(i)** *the prompt conveyance* to the Secretary of title to the property which meets the standards of the Secretary in force at the time the mortgage was insured and which is evidenced in the manner provided by such standards; *and*
> **(ii)** *the assignment to the Secretary of all claims* of the mortgagee against the mortgagor or others, arising out of mortgage transaction or foreclosure proceedings, except such claims as may have been released with the consent of the Secretary.
>
> The Secretary may permit the mortgagee to tender to the Secretary a satisfactory conveyance of title and transfer of possession directly from the mortgagor or other appropriate grantor, and may pay to the mortgagee the insurance benefits to which it would otherwise be entitled *if such conveyance had been made to the mortgagee and from the mortgagee to the Secretary*.

12 U.S.C. § 1710 (a)(1)(B) (emphasis added).

Because federal law and regulations offer but do not require an insured property to be conveyed back to HUD, Plaintiff has not demonstrated that she was

entitled to an occupied conveyance. Thus, Plaintiff has not established a likelihood of success on her breach of contract claim.

**2. Irreparable Injury**

The second factor in determining whether to issue a temporary restraining order requires the Court to assess whether Ms. Poindexter will suffer irreparable injury in the absence of an injunction. "In evaluating the harm that will occur depending upon whether or not the stay is granted, we generally look to three factors: (1) the substantiality of the injury alleged; (2) the likelihood of its occurrence; and (3) the adequacy of the proof provided." *Michigan Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991). "In addition, the harm alleged must be both certain and immediate, rather than speculative or theoretical. In order to substantiate a claim that irreparable injury is likely to occur, a movant must provide some evidence that the harm has occurred in the past and is likely to occur again." *Id*.

Plaintiff argues that she will be irreparably harmed if she is forced to leave her home. Dkt. No. 5, p. 9 (Pg. ID 63). Ms. Poindexter attaches two doctor's notes, which state that she "is unable to move from her home" and that it is "not recommended for [Ms. Poindexter] to move or use stairs." Dkt. No. 5-1, pp. 10–11 (Pg. ID 74–75).

Considering the evidence and the harm alleged, the Court determines that this factor does not weigh in favor of issuing the temporary restraining order. Although Ms. Poindexter's conditions are not likely to improve, *see* Dkt. No. 5-1, p. 10 (Pg. ID 74), Plaintiff admits that her condition continues to deteriorate even while she remains in the home. Dkt. No. 5, p. 2 (Pg. ID 56). Moreover, despite doctor's recommendations, there is no allegation or evidence of what additional injury will be caused. Instead the Court is left to speculate that Ms. Poindexter's injury will somehow be exacerbated apart from the normal course of her condition. However, such theorizing is not permitted. *See Griepentrog*, 945 F.2d at 154.

### 3. Harm to Others

In the third factor, the Court must consider whether issuing the injunction would result in substantial harm to others. *See Certified Restoration Dry Cleaning*, 511 F.3d at 550–51. Plaintiff argues that there is no harm to others because Plaintiff paid and is will to continue paying escrow. Dkt. No. 5, p. 9 (Pg. ID 63). Plaintiff's argument is unpersuasive. In this case, Petru Pusta obtained counsel to seek a judgment against the Plaintiff. Dkt. No. 5-1, p. 4 (Pg. ID 68). The judgment allows Pusta to apply for an order of eviction. *Id*. It further orders that escrow be released to the Plaintiff. *Id*. From the state court judgment, it is clear that Pusta sought and obtained a right to possess the property—not escrow. Accordingly,

Pusta's harm is not assuaged by Plaintiff's willingness to pay escrow. This factor does not weigh in favor of issuing the temporary restraining order.

### 4. Public Interest

The final factor for the Court to consider is "whether the public interest would be served by the issuance of the injunction." *Certified Restoration Dry Cleaning*, 511 F.3d at 551. Plaintiff argues that the public interest is served by "following HUD regulations." Dkt. No. 5, p. 9 (Pg. ID 63). This argument is unpersuasive. Based on the HUD regulations and the limited evidence before the Court, it does not appear that any HUD regulations were violated. Despite Plaintiff's arguments to the contrary, there is a general public interest in the enforcement of voluntarily assumed contract obligations. *Certified Restoration Dry Cleaning*, 511 F.3d at 551. Here, the property was voluntarily sold to a third party. Therefore it is in the public interest to respect that sale. Thus this factor weighs against a temporary restraining order.

### V. Conclusion

The Court sympathizes with Ms. Poindexter's situation. However, "a temporary restraining order is an extraordinary remedy that generally is reserved for emergen[y] situations in which a party may suffer irreparable harm during the time required to give notice to the opposite party or where notice itself may precipitate the harm." *Hacker v. Fed. Bureau of Prisons*, 450 F. Supp. 2d 705, 710

(E.D. Mich. 2006). The Plaintiff may be entitled to equitable relief. However, on the present record, the Court finds that the drastic remedy of granting a temporary restraining order without notice is not justified. Plaintiff's Motion for Ex Parte Temporary Restraining Order is DENIED.

It is further ORDERED that Plaintiff MUST serve Defendants with process and a copy of this order within seven days. Proof of service MUST be filed via CM/ECF forthwith. Defendants MUST file a response with the Court no later than July 21, 2017.

**SO ORDERED**.

Dated: July 7, 2017  s/Gershwin A. Drain
Detroit, MI  HON. GERSHWIN A. DRAIN
United States District Court Judge

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, July 7, 2017, by electronic and/or ordinary mail.

/s/Tanya Bankston
Case Manager, (313) 234-5213